Good morning, Your Honors. May it please the Court. My name is Edward Hernstadt. I am representing Susan Eisner, the appellant in this matter, in her appeal of the District Court's order dismissing her complaint alleging disability discrimination and retaliation under the ADA and the New York City Human Rights Law. The District Court erred in dismissing the complaint based on its findings that Ms. Eisner had failed to show pretext to refute the two allegedly non-discriminatory reasons the city had proffered to justify her discharge, the 2012 evaluation, and her supposed billing problems in the month after Sandy. They were billing problems, weren't they? Well, the real billing problems was the fact that in November the city had been closed for a few days, she's doing everything remotely, and there was some double billing of about 40 hours. Which she confessed to. She didn't confess to it. She actually went to the city and talked to first her supervisor, Frank Caputo, and then two different people in the billing areas of the city to try and rectify it. She said, oh, you can see I billed 7 hours on this matter and at the same time I billed 7 hours on that matter. It's an error. Can we fix this? And this was in December of 2012, long before she was fired and long before the investigation of her EEO complaint was taking place. So it wasn't a matter of confessing. Don't forget, the city doesn't actually bill anyone for time. This is a matter of keeping track of what their employees are doing. So it's not a matter of, is she stealing from someone? It's a matter of, are the records accurate? She tried to fix them. Your adversary says that the bills that were initially submitted said she'd worked 23 days, almost 50 hours, on a brief that was due very shortly after Sandy hit. So that the employer was disturbed that, in a sense, the brief could never have been finished on time. Well, the brief was never going to be filed when it was alleged to be filed. The record hadn't even been completed as of the day that Hurricane Sandy turned everything upside down. The city routinely asked for extensions of time, and that's what was going to happen here. That was previewed. It was an extremely long record. It was considered a brown dot case, which means a supersized record. It had over 1,600 pages of deposition transcripts. A lot of the time that Ms. Eisner spent on it before Sandy was reviewing the transcripts and getting the record together. That was only 37 hours, by the way. They exaggerated that. One of the problems here is that the city never investigated Ms. Eisner's actual billing. It did not look at the work she did. It did not look at the actual hours. It never corrected the actual hours. It persisted in blaming her for 40 hours of work that she never did, and she told them, that's not time on this case. It counted 15 hours that she worked on another case, the Nassir case. In order to reach the conclusion it did, the district court bent over backwards to find facts, draw inferences, resolve ambiguities. It considered the record against Ms. Eisner and in favor of the moving party, the city. It considered the record in a piecemeal fashion, looking at each specific thing and finding a fact about it, rather than in the context of the whole. It ignored or minimized facts that even the district court acknowledged were disputed. As is often the case in summary judgment motions, this is about the facts, and specifically, whether Ms. Eisner raised genuine issues of material fact regarding these allegedly non-discriminatory reasons, so that a juror could believe that retaliation or discrimination was the real reason for her discharge. Counsel, I want to step back a second. As I read this record, her supervisors were disappointed that as Ms. Eisner gained in seniority, she wasn't gaining in ability. That is, she wasn't keeping up... She should have been a supervisor herself after 10 years in the job, and she wasn't actually growing into that job. Is that a reason to let someone go? Isn't it a legitimate reason? That's not actually true, though. First of all, there's nothing in the record about she should have been a supervisor herself, just to be clear. But second of all, there's nothing in the record that shows, except for the contested 2012 evaluation, which is so riddled with flaws, that alone it raises questions of fact. But the prior evaluation, the 2011 evaluation, said that she was better than generally expected for someone of her experience. That one had an overall 2.5. Yeah, an overall 2.5, the city says, is better than what we expect for someone of your experience and your tenure. The fact that other people might have 1s means that she's not the best in her group, but under the city's own guidelines, they review hundreds and hundreds and hundreds of attorneys every year. This is how they assess them, and their own standards say she was better than . . . In 2011, Steve McGrath said she was better than what was expected of someone of her tenure. Sorry? It seemed to show an inability to manage complex cases that her years in the job would have entitled her to work on. Is that a legitimate ground for termination? I don't think we can get to that question because it's not true. There are disputed facts about that. Assume for the sake of this question, if she couldn't manage the complex cases that her peers at the office could manage, that is, other people who were there 10 years, is that a legitimate basis for termination? If she was reviewed, if there were a review that said she is below a 3, which the 2012 said, but if there were reviews that said she was below a 3, the city's policy, their practice, as shown in a 2016 case, Gordon v. City of New York, is you give someone a 4, you then put them on a performance plan. If she failed to resolve the issues raised in the performance plan, eventually, yes, they would be able to fire her for that. That's not the situation. The facts of this case are completely different. The client in the Rosenblum case insists that Ms. Eisner be taken off the matter? First of all, that's inadmissible hearsay and cannot be considered on a motion for summary judgment. They didn't put in any actual testimony of it. The people who testified to that, Kerner and Pestana, didn't remember who said it, didn't remember when, didn't remember the circumstances, and more importantly, Kerner also... I'm not understanding the hearsay problem. They did put in declarations that they received complaints, right? They said that some unknown person said something they didn't really quite remember. And that might... the fact that they can't remember who it was might pose a problem for a fact-finder, but I don't think it's a hearsay problem. Well, I think it's being... It might be worth less weight because the person doesn't remember the specifics, but the declaration is, this attorney, people were complaining about her. No, there wasn't a complaint about her. There was a complaint about the oral... Let's talk about the oral argument because Ms. Eisner admitted that the one COIB attorney who was present in the oral argument wasn't happy because the judge was very tough. There is nothing to indicate she was asked off the oral argument. In fact, Georgia Pestana said... For the Court of Appeals, Georgia Pestana said in an email that was always going to be Steve McGrath. She was never going to do the oral argument there. So she wasn't asked off the oral argument. She wasn't taken off the case. She worked on the case for another two years. Her brief prevailed in the Court of Appeals, and Steve McGrath gave her an excellent review for both her oral argument, the one that someone at COIB complained about, and her writing on that case. Finally, even Len Kerner said that, look, sometimes these people complain. Sometimes the clients, like the COIB, complain, and I think it's sour grapes. So that alone is enough to raise the question of fact as to why is this in this review? And the fact surrounding the review, the fact that Kerner had never done one of an attorney, had not supervised personally, the fact that while the review itself, the city says you have to have personal knowledge of what you put in it, Len Kerner had no personal knowledge of anything he put in it. The fact that some of these matters, like Rosenblum, happened two years before, in 2010, why is it in a 2012 review? That's sufficient to permit a reasonable finder of fact to believe that retaliation or discrimination is the real motive here. Thank you. All right, well, you've reserved three minutes for rebuttal. Thank you. And we'll hear from the government. May it please the Court, I'm Daniel Mazza-Brown, Assistant Corporation Counsel. Yes, bring the microphone. On behalf of the appellees. Is that better, Your Honor? Yes, thank you. Great, thank you. Judge Shinlin correctly granted summary judgment for the city based on uncontroverted, undisputed evidence that the city had identified numerous serious problems with Ms. Eisner's work, which warranted her termination. In 2011, Ms. Eisner received, by far, the worst evaluation in her division in an evaluation she does not contest that was written by a supervisor who she does not claim had any motive to discriminate or retaliate against her. That was Mr. McGrath, Your Honor. McGrath. Exactly. That was the review in which she received 2.5. When everyone else received a 1 or 1.5, she received a much worse evaluation that year. She does not contest the substance of that evaluation or the score. Around that same time, the Conflicts of Interest Board was livid about her performance in an oral argument and told Mr. Kerner she had done a terrible job. Now, Mr. Kerner identified, not by name, but by position, the person who made that complaint. Then, yet another attorney outside... Mr. McGrath testified, and correct me if I'm wrong, that Ms. Eisner's performance on the Rosenboom case reflected a very good work attitude and elicited praise from him. That's right. In Mr. McGrath's evaluation, he wrote that she had done a good job coordinating, basically taking in comments from other attorneys and sort of inputting them into a brief. That was after she had been asked off the case, and so he was praising her attitude under those circumstances, Your Honor. Shortly after her removal from that case, she received criticism from yet another attorney outside of the division, Ms. Pastana, and it's undisputed that this was in connection with a motion for leave to appeal and that the draft motion for leave did not include crucial arguments about why leave to appeal is warranted. But she didn't completely re-edit it. She just made what she said was a change, a big change. That's right, Your Honor. The parties disagree about how to characterize the extent of the edits, but what is completely undisputed here is the draft that was provided to Ms. Pastana did not include very important arguments about why leave was warranted, and this was to the Court of Appeals of New York, which, like the U.S. Supreme Court, does not take all of its cases, and so it's required by statute, and in order to be successful in a leave motion, these reasons are sort of appellate attorney 101 in terms of what should be included in the briefing. After that, her division chief was angered by her refusal to argue a consolidated Court of Appeals case in the manner that her supervisors believed the Court wanted it to be argued. Ms. Eisner's position there was that she would either argue the case on her own terms or not argue it at all. Is it correct that she got what was perhaps the worst evaluation she'd gotten within days or at least close proximity of settling her previous discrimination case? That's right, Your Honor. She was delivered the evaluation about a month after the settlement, but I guess the document appears to be dated one or two business days after the settlement of that lawsuit. There's no authority that the plaintiff points to suggesting that the relevant time period is the amicable settlement of a dispute, which involved complaints that she had raised long before the evaluation period. More importantly, the record is clear, and there's testimony that it was typical and generally done to provide evaluations in that precise time period, about 30 days after the fiscal year had ended. On reply, plaintiff says that Judge Shinlin makes up facts about that, but the testimony from Mr. Mills is clear that that was the general practice of the law department, and in the Chen case from Judge Livingston, the Court clearly holds that when timing coincides with the general practices of an agency or employer, that does not constitute evidence of retaliation sufficient to raise a triable issue of fact. Now, all of these issues that I've described were summarized in the 2012 evaluation, which reached the same conclusion as the 2011 evaluation, which was that Ms. Eisner was by far the lowest-performing employee in the division. Now, I feel really queasy judging the work of lawyers on a five-point scale. What was her success rate with her appeals? Did she prevail? I know it's not in the record, but... It's interesting that you ask that question because there's a dispute about whether she can handle complex cases. The dispute really is whether, and there is no dispute, that the law department genuinely believed that she could not. But on reply, on appeal, she now cites eight cases that page, I think, four of her reply brief, claiming these are complicated cases. Two out of those eight, she did not prevail on. So that's already a 25% loss rate. But even more... ...the loss rate of the entire department. There's nothing in the record on that, Your Honour. But I think, more importantly, on that issue, where she is now resorting, because she has no evidence that she could actually handle complex matters, she's now resorting to go outside the record. Four of those eight cases were before this Court, and she calls them expedited appeals in her brief. They were not. A cursory review of Pacer will show that she spent three, four, or five months submitting her appellees' briefs in these matters, which were not expedited. The other four of those eight were state court cases, three of which were family court matters. ACS matters. And the criticism in the evaluation she complains about says she could handle ACS matters, but not more complicated matters. So three of the eight there are exactly the sorts of cases that there's no dispute that the law department thought were simple and she could handle. The last case, the fourth state court case, is Stevenson, which I believe she was assigned by Mr. McGrath after he said maybe we should give her more complicated cases. But then Mr. McGrath left. Mr. Caputo supervised her. He testified at length in his deposition about how poorly she performed on the Stevenson case. And I think also for her to characterize these cases on reply as complex, her brief in one of them was seven pages long. I think it just shows that to the extent she believes she might be able to handle complex matters, her citation to these cases does nothing at all to undermine the law department's firmly held belief that she cannot do so. And the only thing, it corroborates that she did not handle such cases. Why isn't this seemingly irreconcilable testimony between Kerner and Caputo about this evaluation pretty strong evidence of retaliation? Well, Your Honor, they agree on the basic facts, which is that Caputo was happy not to do it and Mr. Kerner was willing to and wanted to take it on himself. I think that the differences in the recollections seem to be who sort of prompted the conversation. But I wouldn't say that they're irreconcilable. It simply shows that over the course of numerous conversations of these two attorneys who worked together all the time, that they didn't exactly remember how they got to that place. I think that what's much more important is that these sorts of inconsistencies are immaterial to the outcome here. And to say that Mr. Kerner's decision to do the evaluation himself rather than Mr. Caputo somehow impacted her termination makes no sense here, right? Your Honor, my colleague says that it was highly unusual, that there was no other time where someone not personally involved in supervision steps in to do the evaluation. Yes, it was unusual, Your Honor, and I think that what's important is to look at the record as a whole and ask, why was it unusual? And it was unusual because this was the only employee who had a far, far worse evaluation the year before who'd been the subject of at least two complaints from attorneys outside the division in the past couple of years. The previous settlement in which the department conceded that she was entitled to money damages for the way she was treated. That's right, Your Honor, that's right. And viewed as a whole, Mr. Kerner, especially when her supervisor left halfway through the period, Mr. Kerner had information that Mr. Caputo did not about things he believed were relevant to her job performance. While it was unusual, it certainly does not suggest a retaliatory motive. And plaintiff has the burden here of showing that she would not have been fired but for retaliation. And so she has to show that the law department somehow would not have terminated somebody who received an uncontested horrible... It's pending out there. In many cases, we've declined to reach it because she either would win on either standard or lose on either standard. That's right, Your Honor. I believe this is the former where she wins on either standard. And under the but-for standard, this court would have to find that the law department somehow would not have terminated somebody who received by far the lowest score in an uncontested evaluation and received two serious complaints from outside attorneys and refused to argue in the court of appeals on the terms that her supervisors directed and then submitted facially unbelievable time notes in a matter where the brief should have been completed a few days after. Can I ask you about the court of appeals argument? Is it clear that the record says that she refused to argue on the terms that were requested as opposed to she made a choice among two alternatives that her supervisor gave her? Your Honor, Mr. Kerner's perception, which is what is at issue here, whether that was a genuine perception, was that she argued and argued with her supervisor where they said, look, this is what the court of appeals means. She says, no, I want to do it this way. No, this is what the court of appeals means. No, I want to do it this way. And eventually she said, okay, if we have to do it the way you want to, I'm not going to do it. I will only do it the way I want to do.  Yes, Your Honor, and that was exactly how it was characterized by Mr. Mills at the meeting describing the reasons for her termination. She paid for her ability to make these decisions as a lawyer. I can't see how that would be insubordination if they disagreed on trial strategy or appellate strategy. Your Honor, I think it was insubordination to the extent that she repeatedly insisted that her way made more sense, despite her supervisor's vast experience in the court of appeals. Initially, I think at page A315 of the appendix, she actually asks her supervisor, when he says to do it this way, she says, no, go to the division chief. I want you to ask him. I'm sorry, when she first is emailing with her direct supervisor on this issue, she pushes back with respect to his view of how things should be argued and says, no, I want you to go talk to the division chief about this to get his view. I briefly just want to, as I close up, I want to touch on just one point that was made about the time records and the Haas briefing, which is the point that is now raised on reply in an argument that somehow it was going to be extended. Ms. Eisner is now trying to change the goalposts here. She conceded in the 56.1 statements that the brief had been ordered on, it would be dismissed if it was not filed by the deadline and there was not going to be an extension sought. That's at page A139 of the city's 56.1 and not disputed at page A228 and 229 of the appellees. If there are no further questions. Thank you, counsel. Thank you. Mr. Bernstein, you've reserved three minutes for rebuttal. Thank you. I'd like to address some of the points that the city raised. First of all, on the Nash case, if you read the emails, you can see that it's a very cordial, very professional exchange where a choice is given and she opts because she's a part-timer with two weeks to go before the argument,  and learn an entirely new record in the court of appeals. That was a choice that was given to her that she accepted. The city paints that, starting on the first page of the brief, as her refusing to argue. She never refused to argue her case. One point she made is, hey, the court of appeals wants this to be an argument that goes smoothly. The other side is not going to argue it the way you want me to argue it. So we're defeating the purpose of the court of appeals by arguing it in two different ways. Your position that her supervisor told her what? Her supervisor said, hey, do you want to . . . This is what Kalkstein, Julian Kalkstein, who's the other appellate lawyer, and his supervisor want to do is, you argue half of his case, not half, most of his case, and he'll argue this one side issue of his case. That's how they want to do it. What do you think? She was like, I can't do that. I don't have time. I'm a part-timer. I'm not permitted to work more than three days a week. Can we do it? We each argue our own case. That's the way the other side is going to do it, so it will make more sense in front of the court of appeals as well. And he said, no, this is the way we want you to do it. It's your choice. Whichever you want is fine. And she took the one. It's important to note that no one said anything at the time about insubordination. This happened in December of 2011. There was no memo written, no performance evaluation given. She wasn't fired from insubordination. Lane Kerner said nothing. Steve McGrath said nothing. There was absolute silence about this until her review. In terms of the timing of the review, you know, the fact is the city settled on her prior charge of discrimination. They paid her every penny she was owed and put all the time back into her account. And they did that days before they knew that they were going to be finalizing this 2012 evaluation, which trashed her for things that happened and were praised in prior evaluations. I think that's relevant because the inference that any fact finder could draw from that is that they wanted to clear that out because if she had gotten this review, she would never have settled. Then there would have been another charge and there would have been a much bigger case going back to 2009. In terms of saying that this notion that she can't handle complex cases, Rosenblum, a very complex case of the conflict of interest board, everyone testified how important it was. Her briefs prevailed in the Court of Appeals. D'Angelo was a complex case. While she was taken off of it after the first department, her motion succeeded. One of the things that the city said was that the motion was missing the most important, you know, some kind of essential argument. The truth is Steve McGrath, her supervisor, reviewed it. The fire department edited it. The fire department attorney edited it. Neither of them put that in. It was a single paragraph about a policy point, which is exactly what you want a senior person like Georgia Pestano, who's the head of labor employment, to put into a brief. That's why people read briefs. That's why you edit it together. I think we're also losing sight of the fact of all the extraordinary things about this 2012 evaluation, that Kerner was including things that had been already positively reviewed, that he had no personal knowledge. And the review itself says, directs the reviewer, only put things in it that you have personal knowledge about. Pestano, who was supervising Ms. Iser on this D'Angelo case, at the same time she's defending the city and her boss Cardozo, which is something she said is such a serious conflict that she took Iser off of some labor employment cases the year before. Pestano put in a negative thing into the review. Michael Cardozo personally reviewed it. Michael Cardozo directed Pestano, the head of labor employment, to personally review this evaluation with Len Kerner. It is redolent with extraordinary facts that stand out and distinguish it from any other review, except possibly one done of another person who filed an EEO charge against Cardozo, because that's what one of the emails said, is he wants to look at two evaluations. And I know the other one has a lawsuit against the city now, too. The same with the EEO investigation that Miro Gertrufant did. The city policy is absolutely clear. If a head of an agency is named in a complaint, you must send it to another agency to investigate. They completely ignored that and then did a 30-page investigation report that focused almost entirely on billing. There are so many not just disputed issues of fact, but undisputed facts that go the opposite way that the court found, that clearly there are genuine issues. Thank you both for the argument. Thank you. We'll reserve decisions.